# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DIVISION IN THE
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY, an Ohio Corporation, | )<br>)<br>) |
| Plaintiff, | ) Case No. 1:21-cv-96 |
| vs. | ) Judge |
| DOSTIE DRYWALL, INC., a Vermont Corporation; STEVEN F. DOSTIE, a Vermont Resident; and LYNN BARNABY, a Vermont Resident, | )<br>)<br>)<br>) |
| Defendants. | ) |

## INDEMNITY COMPLAINT

NOW COMES Plaintiff, The Cincinnati Insurance Company ("CIC"), by and through its undersigned counsel, and for its Indemnity Complaint against the Defendants, Dostie Drywall, Inc., Steven F. Dostie and Lynn Barnaby (collectively, the "Indemnitors"), respectfully states and alleges as follows:

## PARTIES

1. CIC is organized and existing under the laws of the State of Ohio and is residing in Ohio with its principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014.

2. Defendant Dostie Drywall, Inc. ("Dostie") is organized and existing under the laws of the State of Vermont and is residing in Vermont with its principal place of business at 154 Brentwood Dr., Box 3, Colchester, Vermont 05446.

3. Defendant Steven F. Dostie is a Vermont citizen and resident residing at 4484 Roosevelt Hwy., Colchester, Vermont 05446.

4. Defendant Lynn Barnaby is a Vermont citizen and resident residing at 4484 Roosevelt Hwy., Colchester, Vermont 05446.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this cause under 28 U.S.C. §1332(a)(1) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00, and is between citizens of different states.

6. Venue is proper in this Court pursuant to the terms of paragraph 26 of the Indemnity Agreement, as defined below, titled "**WAIVER OF JURISDICTION, VENUE AND PERSONAL JURISDICTION**", which states, in relevant part, the following: "Undersigned consent to personal jurisdiction and venue and may be sued by Surety in any County of any State and any County where said Court would have venue and personal jurisdiction over the Surety." *See* Indemnity Agreement, ¶26, Exhibit A hereto. (emphasis included in original).

## FACTS COMMON TO ALL COUNTS

### A. The Bond and Indemnity Agreement

7. CIC is in the business of, among other things, extending surety credit to contractors through the issuance of surety bonds that secure certain obligations of those bonded contractors on private and public construction projects throughout the United States.

8. Dostie was, at all relevant times hereto, engaged in the construction industry as a contractor for a variety of construction projects located within the State of Vermont.

9. Dostie, as subcontractor, entered into a Subcontract Agreement dated November 24, 2017 ("Subcontract") with Benaka, Inc. ("Benaka"), to perform certain drywall construction work on the project commonly referred to as the CURZ152813 Alter B-140 Squad OPS Facility

and CURZ152807 F-35 B-140 Squad OPS Facility Vermont Air National Guard, 106 Nco Dr. South Burlington, VT 05403 ("Project").

10. At the request of Dostie and as required by the Subcontract, CIC, as surety, issued payment and performance bond no. B-2794899 ("Bond") on behalf of Dostie, as principal, for the benefit of Benaka, as obligee, to guarantee Dostie's performance under its Subcontract on the Project.

11. In exchange for CIC's extension of surety credit – issuance of the Bond, the Indemnitors executed an Agreement of Indemnity ("Indemnity Agreement") in favor of CIC on November 22, 2017. A true and correct copy of the Indemnity Agreement is attached hereto as <u>Exhibit A</u>.

12. On or about November 22, 2017, Dostie, by and through signature of its President, Steven F. Dostie, executed the Indemnity Agreement.

13. On or about November 22, 2017, Steven F. Dostie, in his individual capacity, executed the Indemnity Agreement.

14. On or about November 22, 2017, Lynn Barnaby, in her individual capacity, executed the Indemnity Agreement.

15. Through the execution of the Indemnity Agreement, the Indemnitors agreed to be jointly and severally liable to reimburse and indemnify CIC for any losses and expenses incurred (1) by reason of having issued the bond; (2) by reason of the Indemnitors failing to comply with the terms of the Indemnity Agreement; or (3) in enforcing the terms of the Indemnity Agreement. The Indemnity Agreement states, in pertinent part, the following:

> INDEMNITY
>
> SECOND: The Undersigned shall exonerate, indemnify and keep indemnified the Surety from and against any and all liability for losses and expenses of whatsoever kind or nature, including the fees

>and disbursements of counsel, and against any and all said losses and expense which the Surety may sustain or incur (i) by reason of having executed or procured the execution of any Bond or Bonds: (ii) by reason of the failure of the Undersigned to perform or comply with the covenants and conditions of this Agreement; or (iii) in enforcing any of the covenants and conditions of this Agreement. The Surety may pay or compromise any claim, demand, suit, judgment or expense arising out of such Bond or Bonds and any such payment or compromise shall be binding upon the Undersigned and included as a liability, loss or expense covered by this Indemnity Agreement, provided the same was made by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all of the circumstances. In the event of any such payment or compromise by the Surety, an itemized statement thereof sworn to by any representative of the Surety familiar with the facts, or the voucher or vouchers or other evidence of such payment or compromise shall be prima facia evidence of the facts and the amount of the Liability of the Undersigned under this Agreement.

*See* Indemnity Agreement, ¶2, attached hereto as <u>Exhibit A</u>.

16. The Indemnity Agreement further provides that if the Indemnitors desire that CIC resist and litigate a claim, that the Indemnitors must first (1) give notice to CIC to this effect; (2) simultaneously deposit with CIC cash or other collateral satisfactory to CIC in an amount determined to be sufficient by CIC to cover the claim, including interest and fees; (3) or deposit cash with CIC in amount satisfactory to CIC; and (4) take over the resistance and litigation of the claim using counsel approved by CIC. The Indemnity Agreement provides, in relevant part, the following:

>If the Undersigned desire that a claim or demand against the Surety be resisted and litigated, the Undersigned shall: (i) give notice to the Surety to this effect: (ii) simultaneously deposit with the Surety cash or other collateral satisfactory to the Surety in an amount determined by the Surety to be sufficient to cover the claim or demand and interest thereon to the probable date of disposition plus attorneys' fees; (iii) or deposit simultaneously with the Surety cash or collateral satisfactory to the Surety; and (iv) take over the resistance and litigation of the claim or demand using competent counsel approved in advance by the Surety.

*See* Indemnity Agreement, ¶2, attached hereto as <u>Exhibit A</u>.

17. Pursuant to the terms of the Indemnity Agreement, the Indemnitors assigned, transferred and conveyed to CIC (1) all monies due or to become due on the Project; (2) all right, title and interest of Dostie's equipment and other supplies and material; (3) all right, title and interest in all subcontracts covered by the Bond; and (4) all causes of actions or claims covered by the Bond. The Indemnity Agreement provides, in relevant part, the following:

> THIRD: With respect to each Bond executed by the Surety, the Principal and Indemnitors presently assign, transfer and convey to the Surety, but subject to the trust created: (a) all monies due or to become due to the Principal under or as a result of the contract covered by the Bond, including, but not limited to, progress payments, deferred payments, retained percentages, compensation for extra work and proceeds of damage claims; (b) all right, title and interest of the Principal in and to all supplies, tools, plant, equipment and materials of every nature and description that may now or hereafter be in, on or around the site of, or the work under, the contract covered by the Bond, and materials purchased or ordered for the performance of said contract whether in the process of construction, in transit to the site, or in storage elsewhere; (c) all right, tittle and interest of the Principal in and to all subcontracts, let or to be let, in connection with said contract, covered by the Bond and in and to all Surety Bonds covering such subcontracts; and (d) all actions, causes of actions, claims and demand whatsoever with the Principal subcontractors, laborers, materialmen or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of the contract covered by the Bond, and against any Surety or Sureties of such subcontractors, laborers or materialmen. The foregoing Assignment shall be effective as of the date of the execution and delivery of this Agreement as to each contract covered by bonds executed prior to such date although nothing herein shall limit the right of the Surety to claim under any prior Assignment. With respect to any Bond executed and delivered on or after the date of execution and delivery of this Agreement, the Assignment shall be effective as of the effective date of the Bond.

*See* Indemnity Agreement, ¶3, attached hereto as <u>Exhibit A</u>.

18. The Indemnity Agreement provides CIC the discretion to settle or compromise any claims against the Bond and states that such loss or expenses incurred by the settlement or

5

compromise is binding upon the Indemnitors and reimbursable to CIC under the terms of the Indemnity Agreement. The Indemnity Agreement provides, in relevant part, the following:

> SIXTEENTH: The Surety may pay or compromise any claim, demand, suit, judgment or expense arising out of any Bond or Bonds and any such payment or compromise shall be binding upon the Undersigned and included as a liability or expense covered by this Indemnity Agreement, provided the same was made by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all circumstances.

*See* Indemnity Agreement, ¶16, attached hereto as <u>Exhibit A</u>.

19. The Indemnitors appointed CIC as their attorney-in-fact with the right to exercise all of the Indemnitors' rights assigned, transferred or set over to CIC by the execution of the Indemnity Agreement. The Indemnity Agreement provides, in relevant part, the following:

> TWENTY-FIRST: Each of the Undersigned hereby irrevocably nominate, constitute, appoint and hereby designate the Surety or any person or persons designed by the Surety as his attorney-in-fact with the right to exercise all of his rights assigned, transferred or set over to the Surety by this Agreement and in his name to execute and deliver any and all additional or other assignments, instruments, or documents deemed necessary or desirable by the Surety: (i) to vest in the Surety absolute title to any and all monies, property and rights hereby assigned; (ii) to provide the protection and rights to the Surety contemplated by all of the provisions of this Agreement; and (iii) to give notice to any Obligee that checks representing any amounts due under any contract, including retainage and damages, be sent to the Surety, and the Surety is empowered by this Agreement to endorse all checks payable to the Undersigned for deposit in the account of the Surety as attorney-in-fact for the Undersigned. The Surety or any person or persons designated shall have the absolute power to execute any and all needful and necessary documents to conclude any contract.

*See* Indemnity Agreement, ¶21, attached hereto as <u>Exhibit A</u>.

20. The Indemnity Agreement also provides that the rights afforded to CIC under the Indemnity Agreement are cumulative and failure to exercise any right or remedy available to it shall not constitute a waiver. The Indemnity Agreement provides, in relevant part, the following:

6

> TWENTY-FIFTH: All rights and remedies of the Surety under this Agreement shall be cumulative, and the exercise of or failure to exercise any right or remedy at any time shall not be an election of remedy or a waiver of any other right or remedy. Failure of the Surety to pursue any legal remedy against any one or more of the Undersigned shall not release or waive any right against any other of the Undersigned. Surety is not required to exhaust its remedies or rights against the Principal or to await receipt of dividends from legal representatives of the Principal before asserting its rights under this Agreement against the Indemnitors. The rights, powers, and remedies given to the Surety by this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers and remedies which the Surety may have or acquire against the Undersigned or others whether by the terms of this Agreement, by operation of law, or otherwise.

*See* Indemnity Agreement, ¶25, attached hereto as <u>Exhibit A</u>.

### B. Termination of Dostie and Benaka's Bond Claim

21. Subsequent to issuing the Bond, on or about November 9, 2018, Benaka served Dostie with a notice to cure letter alleging that Dostie was in default of the Subcontract for its "failure to maintain project progress, failure to adequately staff this project, failure to complete the work per industry standards, failure to meet the contract requirements, and failure to perform corrective work." ("Notice to Cure") A true and correct copy of the Notice to Cure is attached hereto as <u>Exhibit B</u>.

22. The Notice to Cure letter warned that failure to cure the noted deficiencies would cause Benaka to terminate the Subcontract. *See*, Notice to Cure, <u>Exhibit B</u>.

23. Thereafter, Benaka terminated the Subcontract on or about November 14, 2018 alleging that Dostie failed to come back to work on the Project after receiving the Notice to Cure ("Termination Letter"). A true and correct copy of the Termination Letter is attached hereto as <u>Exhibit C</u>.

24. Both the Notice to Cure and Termination Letter were sent to Dostie and Cheeseman Insurance, Inc. ("Cheeseman"), and neither Dostie nor Cheeseman sent the Notice to Cure or the Termination Letter to CIC.

25. The first time CIC became aware of the issues was on or about February 5, 2019, 30 days later, when CIC received a letter titled Notice of Termination for Default/Breach of Contract & Performance Bond informing CIC and Dostie that Benaka was continuing to self-perform Dostie's remaining work on the Project ("Bond Claim"). A true and correct copy of the Bond Claim is attached hereto as Exhibit D.

26. Benaka's Bond Claim totaled $231,283, which is broken down as follows:

| Description | Amount |
|---|---|
| Carpenter Wages from November 9, 2018 | $168,311 |
| Labor Wages from November 9, 2018 | $13,698 |
| **WAGES** | **$182,009** |
| | |
| PR OH @44% | $80,084 |
| **TOTAL PR COST** | **$262,093** |
| | |
| Crestone – Wood Ceiling / Ceiling Subcontractor | $24,500 |
| Crestone – Ceiling Tiles | $6,340 |
| Kamco – Ceiling Tiles | $76,053 |
| Kamco – Building Supplies | $61,323 |
| Curtis Lumber | $7,759 |
| Chucks Heating and Cooling – Stair Riser Covers | $5,974 |
| Hilti | $1,632 |
| Marjam – Building Supplies | $7,424 |
| Trowel Trade – Supply | $1,615 |
| Wall Board – Supply | $13,278 |
| Got That Rental | $122 |
| **TOTAL MATERIAL AND SUB COSTS** | **$206,020** |
| | |
| **TOTAL COST TO DATE TO COMPLETE** | **$468,113** |
| | |
| **DOSTIE CONTRACT BALANCE AT TERMINATION** | **($236,830)** |

8

| | |
|---|---:|
| **COST TO COMPLETE IN EXCESS OF REMAINING CONTRACT BALANCE** | **$231,283** |

**C. CIC's Investigation of Benaka's Bond Claim and Settlement of Benaka's Bond Claim**

27. Notwithstanding, Dostie's and Cheeseman's failures to forward the correspondences onto CIC, once CIC received the Bond Claim CIC immediately began to investigate Benaka's Bond Claim.

28. As part of CIC's investigation, on or about February 19, 2019, CIC provided notice to Dostie of the Bond Claim and requested Dostie to provide CIC with certain documentation and any and all defenses it has to Benaka's Bond Claim.

29. Dostie did not respond to CIC's February 19, 2019 request for documentation and/or defenses.

30. On or about March 1, 2019, CIC sent its second request for documentation and defenses to Dostie.

31. Dostie did not provide a substantive response to CIC's March 1, 2019 correspondence.

32. CIC also made multiple requests for Benaka's documentation and exchanged numerous correspondences related to various defenses CIC asserted against Benaka's Bond Claim.

33. CIC engaged the services of Vertex Companies, Inc. ("Vertex"), a construction consultant, to conduct a site visit of the Project in order to evaluate the status of the Project, as well as review Benaka's documentation to confirm that its alleged costs were, in fact, costs incurred to complete Dostie's scope of work.

34. CIC also engaged the legal services of Watt, Tieder, Hoffar & Fitzgerald, L.L.P. ("Watt Tieder"), to, among other things, review and analyze Benaka's Bond Claim.

9

35. CIC incurred costs to retain Vertex and Watt Tieder for which it is now seeking reimbursement.

36. CIC thoroughly investigated Dostie's Bond Claim, which lasted approximately twenty (20) months.

37. Ultimately, with the reasonable belief that it was liable for the amount disbursed or that such payment or compromise was reasonable under all circumstances, CIC settled Benaka's Bond Claim for payment of $190,000 in exchange for full and mutual releases between CIC and Benaka. A true and correct copy of the Settlement Agreement and proof of payment is attached hereto as Exhibit E.

**D. CIC's Settlement with Cheeseman and Its Insurance Carrier**

38. On or about October 9, 2020, CIC made a demand on Cheeseman and its errors and omissions insurance carrier, Westport Insurance Corporation ("Westport"), alleging that Cheeseman breached its agency agreement with CIC by failing to provide CIC notice of the Notice of Default and/or Termination Letter.

39. CIC alleged that but for Cheeseman's failure to provide notice to CIC of Notice to Cure and Termination Letter, CIC would have had several options to avoid or mitigate its damages. Specifically, CIC could have arranged for the parties to resolve the performance issues during a meeting pursuant to 3.1 of the Bond. Without even considering that option, because CIC did not receive notice, CIC was stripped from exercising its contractual right to select its performance options under the Bond.

40. After several weeks of negotiating, CIC, Cheeseman and Westport settled CIC's claim in the amount of $100,000 and received said settlement payment. A true and correct copy of the settlement agreement is attached hereto as Exhibit F.

**E. CIC's Losses To Date**

41. To date, CIC has incurred losses in the amount of **$136,386.60**, which is broken down as follows:

| Description | Amount |
|---|---|
| Consulting Costs and Expenses – Vertex | $6,490.83 |
| Legal Costs and Expenses – Watt Tieder | $39,895.77 |
| Bond Claim Payment – Benaka | $190,000 |
| Settlement Recovery from Cheeseman and Westport | ($100,000) |
| | |
| **TOTAL** | **$136,386.60** |

42. CIC's ultimate loss will continue to increase, however, as it incurs costs and attorneys' fees in an attempt to seek reimbursement from the Indemnitors. Accordingly, CIC reserves the right to increase this figure as it incurs such reimbursable costs.

**F. CIC Issued Several Indemnity Requests to the Indemnitors but Has Not Been Reimbursed for its Losses**

43. On October 9, 2020, CIC issued its first Indemnity Request to the Indemnitors seeking reimbursement for its losses on or before October 20, 2020 ("First Indemnity Request"). A true and correct copy of CIC's First Indemnity Request is attached hereto as Exhibit G.

44. The Indemnitors did not reimburse CIC for its losses as requested in its First Indemnity Request.

45. On January 22, 2021, CIC issued its second Indemnity Request to the Indemnitors seeking reimbursement for its losses on or before February 21, 2021 ("Second Indemnity Request"). A true and correct copy of CIC's Second Indemnity Request is attached hereto as Exhibit H.

46. The Indemnitors did not reimburse CIC for its losses as requested in its Second Indemnity Request.

47.    To date, the Indemnitors have not reimbursed CIC for any of its losses.

## COUNT I – BREACH OF CONTRACT

48.    CIC adopts and re-alleges paragraphs 1 through 47 as though fully set forth herein for Count I of CIC's Complaint.

49.    The Indemnity Agreement is a binding and enforceable contract.

50.    Pursuant to the terms of the Indemnity Agreement, the Indemnitors are contractually obligated to indemnify CIC from all losses, costs, expenses and fees CIC has incurred in connection with the Bond and in enforcing the terms of the Indemnity Agreement.

51.    In accordance with the terms of the Indemnity Agreement, CIC requested that the Indemnitors reimburse CIC for CIC's losses incurred as a consequence of issuing the Bond.

52.    Despite CIC's requests, the Indemnitors have failed to indemnify CIC and hold CIC harmless from CIC's existing losses, costs, expenses, and fees incurred as a result of issuing the Bond on behalf of Dostie and in enforcing the Indemnity Agreement.

53.    The Indemnitors have materially breached the Indemnity Agreement by failing and refusing to reimburse CIC pursuant to their plain and unambiguous obligations under the Indemnity Agreement.

54.    CIC has satisfied all of its obligations under the Indemnity Agreement.

55.    CIC has been damaged by the Indemnitors' material breach of the Indemnity Agreement in the initial amount of **$136,386.60**.

## PRAYER FOR RELIEF

WHEREFORE, The Cincinnati Insurance Company respectfully requests that this Court enter an Order:

    (a)    Granting a Judgment against the Indemnitors, jointly and severally, in favor

of CIC in the amount of **$136,386.60**, the amount of CIC's losses to date, plus all costs and expenses, including attorneys' fees and interest; and

        (b)     For such additional relief as this Court deems equitable and just.

### COUNT II
### EXONERATION AND QUIA TIMET

56.     CIC adopts and re-alleges paragraphs 1 through 55 as though fully set forth herein.

57.     CIC has previously requested in writing that the Indemnitors indemnify and hold CIC harmless from the claims against CIC's Bond in the amount of **$136,386.60**. This amount will continue to increase as CIC will likely incur additional fees for the prosecution of the instant lawsuit to enforce CIC's rights under the Indemnity Agreement.

58.     As the principal of the Bond, Dostie owes CIC the duty of exoneration, requiring the Indemnitors to perform their obligation before CIC is called upon to perform its obligations under the Bond.

59.     CIC is entitled to a remedy known as *quia timet*. This remedy secures a surety from loss when it appears that the principal is reasonably likely to fail or refuse to perform or to protect the surety from loss.

60.     The Indemnitors have failed and refused to meet their obligations under the Indemnity Agreement by failing to indemnify CIC from the paid claims and fees and expenses incurred as a consequence of issuing the Bond.

61.     CIC is entitled to be reimbursed for the attorneys' fees it has currently paid and to be fully collateralized by the Indemnitors for its potential liability in order to enforce its rights under the Indemnity Agreement.

62. CIC lacks an adequate remedy at law to secure its right of exoneration from the Indemnitors and is without a plain, speedy remedy at law, and will be irreparably and permanently injured unless this Court grants the injunctive and equitable relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, The Cincinnati Insurance Company respectfully requests that this Court enter an Order:

(c) Directing the Indemnitors to indemnify and exonerate CIC for its loss and fees and expenses incurred by CIC as a result of CIC having issued the Bond and in enforcing the terms of the Indemnity Agreement;

(d) Granting a Judgment against the Indemnitors, jointly and severally, in favor of CIC in the amount of **$136,386.60**, the amount of CIC's losses to date, plus all costs and expenses, including attorneys' fees and interest; and

(e) For such additional relief as this Court deems equitable and just.

## COUNT III
## SPECIFIC PERFORMANCE OF THE INDEMNITY AGREEMENT

63. CIC adopts and re-alleges paragraphs 1 through 62 as though fully set forth herein.

64. The Indemnity Agreement requires that the Indemnitors indemnify and reimburse CIC for any losses it incurs (1) by reason of having executed the Bond; (2) by reason of failing to comply with the terms of the Indemnity Agreement; or (3) in enforcing the terms of the Indemnity Agreement. The Indemnity Agreement provides, in relevant part, the following:

> SECOND: The Undersigned shall exonerate, indemnify and keep indemnified the Surety from and against any and all liability for losses and expense of whatsoever kind or nature, including the fees and disbursements of counsel, and against any and all said losses and expense which the Surety may sustain or incur: (i) by reason of having executed or procured the execution of any Bond or Bonds; (ii) by reason of the failure of the Undersigned to perform or comply

14

> with the covenants and conditions of this Agreement; or (iii) in enforcing any of the covenants and conditions of this Agreement. The surety may pay or compromise any claim, demand, suit, judgment or expense arising out of such Bond or Bonds and any such payment or compromise shall be binding upon the Undersigned and included as a liability, loss or expense covered by this Indemnity Agreement, provided the same was made by the Surety in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all of the circumstances. In the event of any such payment or compromise by the Surety, an itemized statement thereof sworn to by any representative of the Surety familiar with the facts, or the voucher or vouchers or other evidence of such payment or compromise shall be prima facie evidence of the facts and the amount of the liability of the Undersigned under this Agreement.

*See* Indemnity Agreement, ¶2, Exhibit A.

65. CIC has requested in writing that the Indemnitors indemnify and hold CIC harmless from any and all costs resulting from the Bond CIC issued for the Projects and in enforcing the terms of the Indemnity Agreement. *See* Exhibits G and H.

66. To date, the Indemnitors have failed to indemnify CIC.

67. The Indemnitors, individually and collectively, have failed and refused, and continue to fail and refuse, to perform their obligations under the Indemnity Agreement.

68. CIC's remedy at law is inadequate, and if the Indemnitors are not compelled to perform their obligations under the Indemnity Agreement, the Indemnitors will likely transfer or dissipate all of their assets in an attempt to avoid their obligations under the Indemnity Agreement.

69. CIC will suffer irreparable harm if any relief sought in this litigation consistent with CIC's rights under the Indemnity Agreement is not granted.

**PRAYER FOR RELIEF**

WHEREFORE, The Cincinnati Insurance Company respectfully requests that this Court enter an Order:

(a) Directing the Indemnitors to indemnify and exonerate CIC for its loss and

fees and expenses incurred by CIC as a result of CIC having issued the Bond and in enforcing the terms of the Indemnity Agreement;

   (b) Granting a Judgment against the Indemnitors, jointly and severally, in favor of CIC in the amount of **$136,386.60**, the amount of CIC's losses to date, plus all costs and expenses, including attorneys' fees and interest; and

   (c) For such additional relief as this Court deems equitable and just.

            Respectfully submitted:

            */s/ David P. Bolek*
            David P. Bolek (0087088)
            Trial Attorney for Plaintiff
            The Cincinnati Insurance Company
            P. O. Box 145496
            Cincinnati, OH 45250-5496
            (513) 603-5272
            Facsimile: (513) 870-2900

Dated: 8th day of February, 2021